IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

YENIFER RODRIGUEZ,                §
                                  §
          Plaintiff,              §
                                  §
v.                                §    CIVIL ACTION NO. H-09-2005
                                  §
OFFICEMAX NORTH AMERICA, INC.,    §
                                  §
          Defendant.              §

MEMORANDUM AND ORDER

_____Pending is Defendant OfficeMax North America, Inc.'s Motion for Summary Judgment (Document No. 31).   After carefully considering the motion, response, reply, and the applicable law, the Court concludes as follows.

I.  Background

In this Title VII and section 1981 case, Plaintiff Yenifer Rodriguez, a Hispanic female born in Cuba, complains of treatment she received while employed as a cashier at one of Defendant OfficeMax North America, Inc.'s ("OfficeMax") retail stores in the Houston area.  She asserts claims of discrimination based on race, national origin, and sex; sexual harassment; retaliation; and intentional infliction of emotional distress.

Plaintiff was employed by an OfficeMax store in Florida in December 2006, and transferred to the Houston store in August 2007.[1]  She reports that her problems began the day after Brian Bowe ("Bowe") became the store manager in January 2008, at which time he allegedly told her and another female cashier that "he will be with all young ladies that he was working with."[2]  Although surprised by the comment, Plaintiff thought nothing of it at the time, and did not report it.[3]  Two to three weeks later, Bowe did not allow Plaintiff to leave for lunch when she asked, allegedly stating that "you're going to go to lunch whenever I want to."[4]  At some point after this, Plaintiff asserts that Bowe offered her his credit card to buy her lunch, which she declined.[5]  Bowe repeated the offer over ten times during the next few months, during which time he also required her to take late lunches another ten or more times.[6]

Plaintiff also asserts that he touched her hair, buttocks, and breasts when walking by her at her cash register or in store aisles

---

[1] Document No. 31, ex. A at 33-35, 42-45 (Rodriguez Depo.).

[2] Id., ex. A at 100.

[3] Id., ex. A at 100-03.

[4] Id., ex. A at 103-04, 107.

[5] Id., ex. A at 110-111.

[6] Id., ex. A at 109-111.

at various times "[a]s soon as he [got] a chance to touch [her] somewhere"--not daily, but more than once a week.[7]  When she asked him to stop, he said he was just trying to stop her from getting in his way, or was accidentally colliding with her.[8]  She told another cashier about one of these incidents, but did not report any of them to anyone else.[9]  He also at one point asked Plaintiff into his office to talk about a customer; once inside, Plaintiff alleges that he moved too close to her and asked her to perform oral sex on him.[10]  She then insisted they take the conversation outside his office, where he suggested Plaintiff take a ride with him on his new motorcycle.[11]

She called a district manager, Wendy Fila, to ask for a transfer in February, but asserted only that Bowe "didn't respect me and I want to have a transfer."[12]  She did not report any of the offensive conduct recounted above.[13]  Fila told her to talk to her

---

[7] Id., ex. A at 130-33.

[8] Id., ex. A at 131.

[9] Id., ex. A at 130-31.

[10] Id., ex. A at 133, 200-03.

[11] Id., ex. A at 133, 203.

[12] Id., ex. A at 138-19; Document No. 33, ex. A at 135-37 (Rodriguez Depo.); Document No. 32, ex. 1 at 4 (Rodriguez Decl.).

[13] Document No. 31, ex. A at 139.

manager to ask for a transfer, so she asked Bowe, who denied the request.[14]  Plaintiff did not contact Fila again.

Plaintiff asserts that Bowe for the first time made comments about her race in May 2008, when he chided her for her incorrect use of the store's speaker system: "Hispanics are good for nothing, who you [sic] think you are.  And I don't know how they give [sic] you the job."[15]  Also in May, Bowe required Plaintiff to stay late to cover for an absent co-worker.[16]  One or two weeks later, Plaintiff again worked long hours--she was at the store from "open to close" on that Friday, Saturday, and Sunday.[17]  She therefore called into work early Monday morning, prior to her 8:00 a.m. shift, to say she was tired and wished not to work that day.[18]  She spoke to "one of the managers that works the morning," whom she asserts told her it would be okay to stay home that day due to her having covered extra hours.

The next day, on May 20, 2008, Plaintiff arrived at work for her 8:00 shift, whereupon Bowe called her into his office and "just start[ed] yelling at me" about the previous day's absence for about

---

[14] Id., ex. A at 138.

[15] Id., ex. A at 149-50, 152-53.

[16] Id., ex. A at 150.

[17] Id.

[18] Id., ex. A at 151.

4

20 to 30 minutes.[19]  Plaintiff had previously been reprimanded at least four times for repeated attendance troubles.  The previous store manager had issued a verbal and written warning to her in the first week of November 2007, due to her being late to work "almost every day," ranging from 15 minutes to one hour and 30 minutes.[20] Bowe had issued a second written warning on January 28, 2008, due to three days of tardiness within one week,[21] and Plaintiff in February was asked to sign and acknowledge her understanding of the OfficeMax attendance policy.[22]  Finally, Bowe issued a "Final Written Warning" on April 25, 2008, warning that further attendance issues would result in termination.[23]

Bowe did not issue another written warning to Plaintiff after the May 2008 absence and did not terminate her.  Instead, Plaintiff asserts that, once she was in his office, Bowe repeated that she was "good for nothing," made fun of her accent, told her to "shut up," told her that he was going to fire her, told her that she was

---

[19] Id., ex. A at 154-55.

[20] Id., ex. A at 87-89; id., ex. A-18.

[21] Id., ex. A at 179; id., ex. A-19.  Plaintiff's tardiness was due to "family problems" that she did not "want to talk about." Id., ex. A at 89.

[22] Id., ex. A at 91-92; id., ex. A-20.

[23] Id., ex. A-21.  Plaintiff did not sign this written warning, which was issued due to tardiness on March 14, 17, 21, and April 23, ranging from 27 minutes to 2 hours and 45 minutes.

going to have to work "morning to night," and told her he would never give her vacation days.[24]  She began to "feel my chest going fast and I feel my head really, really hot," so she asked to be excused, but Bowe allegedly said she would "die before you get out."[25]  She began to cry, he finished saying what he wanted to say, and she went to the bathroom to wash her face; on her way back from the bathroom, she fainted, hitting her head.[26]  She came to with Bowe and others standing over her; she asserts that Bowe told her to get up and stop acting, but that someone else called an ambulance to take her to the hospital, from which she was released the same day.[27]  She went out on medical leave the next day, and then filed for and obtained workers' compensation benefits.[28]

A week later, Plaintiff spoke on the phone with Wendy O'Neill, OfficeMax's regional human resources manager, regarding her workers' compensation claim.[29]  She also told O'Neill about her May 20 meeting with Bowe, and stated that, two to three months

---

[24] Id., ex. A at 154-55, 217.

[25] Id., ex. A at 155-56.

[26] Id., ex. A at 156.

[27] Id., ex. A at 158-59.

[28] Id., ex. A at 70, 211.  As of her April 6, 2010 deposition, Plaintiff claimed still to be unable to work, upon advice of her doctors.  Id., ex. A at 66.

[29] See Document No. 32, ex. A at 6 (Rodriguez Decl.); Document No. 31, ex. B at 2 (O'Neill Decl.).

previously, Bowe "came up behind her because he needed something and touched her arm," that he offered to buy her lunch several times, and that he stated he could have any young girl he wanted.[30] O'Neill investigated the claims the next day by interviewing Bowe and the three witnesses Plaintiff identified: Bob Arnold, Nick Ayers, and Dahlia Manny.[31]   Bowe stated that he never made any comments about young girls; that he may have touched Plaintiffs' arm, but only to alert her when he was coming up behind her to get something from her cash register; and that he frequently gave associates in the store his debit card for them to buy lunch.[32] None of the other witnesses could corroborate Plaintiffs' claims--in fact, Manny stated that Bowe was nice to Plaintiff--and OfficeMax therefore closed the investigation.[33]

Rodriguez filed a complaint with the Equal Employment Opportunity Commission ("EEOC") in July 2008, asserting charges of sex and national origin discrimination, and retaliation, and was issued a Notice of Right to Sue on March 26, 2009.[34]

In the meantime, Plaintiff remained on leave.  On April 8, 2009, OfficeMax sent her a letter reminding her of its leave

---

[30] Document No. 31, ex. B at 2.

[31] Id., ex. B at 3; id., ex. B-1.

[32] Id., ex. B-1 at OFFICEMAX 1232.

[33] Id., ex. B at 3; id., ex. B-1.

[34] Document No. 31, exs. A-23, E.

policy, which limits a leave of absence to six months within any twelve-month period.[35]  The reminder included an instruction that she contact O'Neill on or before April 15, 2009, "to discuss your return to work," and noted that failure to do so would result in an understanding that she "voluntarily wish[ed] to end your employment with OfficeMax."[36]  Plaintiff never responded, and was informed of her termination by letter dated May 22, 2009--but was advised that she was "coded as eligible for rehire" and encouraged to reapply for future openings.[37]

OfficeMax moves for summary judgment, asserting that Plaintiff has failed to present sufficient evidence to make a *prima facie* claim of discrimination; that the complained-of employment actions support neither her discrimination claims nor her retaliation claims as a matter of law; that it has established an affirmative defense to Plaintiff's hostile work environment claims; and that her intentional infliction of emotional distress claim fails because it is based on the same facts as her other claims.

---

[35] Document No. 31, ex. A-14.  This letter represents the culmination of OfficeMax's several attempts to mail to Plaintiff a similar notification, each of which was sent to an outdated address.  *See* Document No. 31, exs. A-13, A-14; Document No. 33, ex. F ¶ 6; id., ex. F-C at OFFICEMAX 846, 864, 872, 874.

[36] Id., exs. A-13, A-14.

[37] Id., ex. A-15.

## II. Discussion

A.   Summary Judgment Standard

Rule 56(c) provides that summary judgment "should be rendered if the pleadings, discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The movant must "demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 106 S. Ct. 2548, 2553 (1986).

Once the movant carries this burden, the burden shifts to the nonmovant to show that summary judgment should not be granted. Morris v. Covan World Wide Moving, Inc., 144 F.3d 377, 380 (5th Cir. 1998). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials in a pleading, and unsubstantiated assertions that a fact issue exists will not suffice. Id. "[T]he nonmoving party must set forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case." Id.

In considering a motion for summary judgment, the district court must view the evidence "through the prism of the substantive evidentiary burden." Anderson v. Liberty Lobby, Inc., 106 S. Ct. 2505, 2513 (1986). All justifiable inferences to be drawn from the underlying facts must be viewed in the light most favorable to the

nonmoving party.   Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 106 S. Ct. 1348, 1356 (1986).   "If the record, viewed in this light, could not lead a rational trier of fact to find" for the nonmovant, then summary judgment is proper.   Kelley v. Price-Macemon, Inc., 992 F.2d 1408, 1413 (5th Cir. 1993).   On the other hand, if "the factfinder could reasonably find in [the nonmovant's] favor, then summary judgment is improper."   Id.   Even if the standards of Rule 56 are met, a court has discretion to deny a motion for summary judgment if it believes that "the better course would be to proceed to a full trial."   Anderson, 106 S. Ct. at 2513.

To withstand a no-evidence motion for summary judgment, the nonmovant must "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."   Celotex, 106 S. Ct. at 2552.   If the nonmovant fails to make such a showing, "there can be no 'genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial," and summary judgment must be granted.   Id.

B. <u>Discrimination</u>

Plaintiff brings disparate-treatment claims under Title VII.[38] Because Plaintiff lacks direct evidence of discrimination, her claims are analyzed under the burden-shifting framework from <u>McDonnell Douglas Corp. v. Green</u>, 93 S. Ct. 1817 (1973). Under this framework, Plaintiff must first create a presumption of unlawful discrimination by presenting evidence of a *prima facie* case. To establish a prima facie case on such a theory, Plaintiff must show that: (1) she was a member of a protected group; (2) she was qualified for her position; (3) she was subjected to an adverse employment action; and (4) she was treated less favorably than similarly situated employees. <u>McCoy v. City of Shreveport</u>, 492 F.3d 551, 557-58 (5th Cir. 2007). Adverse employment actions are

---

[38] In her First Amended Complaint, Plaintiff alleges that OfficeMax's "unlawful employment practices" such as "making fun of [her] accent . . . and humiliating her because of it in [front] of other co-workers, had a disparate and adverse impact on Plaintiff because of her race and national origin." Document No. 16 at 3. The substance of this complaint appears to be one of disparate *treatment*, even though it asserts disparate *impact*, which is a distinct theory of actionable discrimination under Title VII. <u>Pacheco v. Mineta</u>, 448 F.3d 783, 787 (5th Cir. 2006). To the extent Plaintiff claims disparate *impact* discrimination, however, her claim fails as a matter of law because she has identified no employment practices or policies "that are facially neutral in their treatment of [her protected group], but, in fact, have a disproportionately adverse effect on such a protected group." <u>Id.</u>; *see also* <u>Smith v. City of Jackson, Miss.</u>, 125 S. Ct. 1536, 1545 (2005) (noting that an employee is "responsible for isolating and identifying the *specific* employment practices that are allegedly responsible for any observed statistical disparities" (quotation and citation omitted)).

limited to "ultimate employment decisions," such as hiring, granting leave, discharging, promoting, and compensating, and do not include those decisions by employers that arguably might have some tangential effect upon those ultimate decisions. Id. at 559-60. After making this *prima facie* showing, the burden then shifts to the defendant-employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. Lee v. Kansas City S. Ry. Co., 574 F.3d 253, 259 (5th Cir. 2009). If the employer can articulate such a reason, the inference of discrimination falls away, and the burden shifts back to the plaintiff to establish that her employer's proffered reason is merely a pretext for discrimination. Id.

Plaintiff asserts she was subjected to the following adverse employment actions on account of her race, her Cuban origin, or her sex: (1) she was not permitted to go to lunch "at the scheduled period," while others were permitted to; (2) Bowe "denied her a pay raise that she requested"; (3) she was denied paid vacation; and (4) she was terminated.[39]

---

[39] Document No. 32 at 8-10. Plaintiff also appears to argue that she was subject to a hostile work environment based upon race or national origin harassment. *See* id. at 7-8. This claim fails for the same reason that her related hostile work environment claim based on sexual harassment fails, namely OfficeMax's successful assertion of its affirmative defense to liability. *See* below at pages 19-22; *see also* Nat'l R.R. Passenger Corp. v. Morgan, 122 S. Ct. 2061, 2074 n.10 (2002).

As to the first claimed action, denial of permission to leave for lunch similarly to other employees does not constitute an "ultimate employment decision," and Plaintiff has therefore failed to make a *prima facie* case of discrimination based upon this allegation. *See* Watkins v. Tex. Dep't of Crim. Justice, No. H-03-5698, 2006 WL 1581833, at *7-8 (S.D. Tex. June 6, 2006) (the plaintiff's alleged adverse employment actions, including "his supervisor's refusal to permit Plaintiff to leave for lunch like other . . . employees," did not involve "tangible employment actions that significantly changed Plaintiff's employment status"); Kebiro v. Wal-Mart Stores, Inc., 568 F. Supp. 2d 747, 753-54 (E.D. Tex. 2005) (employee's assertion of actions, including that he "was denied breaks or delayed lunch periods," did not constitute "an adverse employment action in the context [of] Title VII and ADEA retaliation claims"); *see also* Watts v. Kroger Co., 170 F.3d 505, 512 (5th Cir. 1999) ("We have held, along with many of our sister circuits, that employment actions are not adverse where pay, benefits, and level of responsibility remain the same.").

With respect to a pay raise, Plaintiff testified that her pay never changed during her nearly three years of employment at OfficeMax.[40]   However, Plaintiff has pointed to no similarly

---

[40] Document No. 31, ex. A at 199 (Rodriguez Depo.).

situated employee who received a pay raise.[41]   Likewise, Plaintiff
has failed to point to any similarly situated employees who were
treated differently regarding vacation time.[42]   She has therefore
failed to make a *prima facie* case of discrimination on both of
these claims.   *See* Cassey v. Coca-Cola Enters., No. CIVA 05-0152,
2006 WL 3862005, at *5 n.7 (W.D. La. Dec. 29, 2006) (failure to
show that similarly situated employees under nearly identical
circumstances "were allowed to take vacation at the time they
wished or work overtime" constituted failure to make *prima facie*
case of discrimination (citing Perez v. Tex. Dep't of Crim.
Justice, 395 F.3d 206, 213 (5th Cir. 2004))).

Finally, Plaintiff has also failed to make a *prima facie* case
on her termination.   She has neither alleged nor pointed to any
evidence regarding the existence of other similarly situated
employees who were not terminated.   Even had she done so, she has
offered no evidence to refute OfficeMax's nondiscriminatory reason

---

[41] Plaintiff testified that she was paid $10 per hour, *see* id.,
ex. A at 36, which is quite close to OfficeMax's *maximum* pay range
for cashiers--$7.25 to $10.25 per hour.   Document No. 33, ex. F at
1 (O'Neill Supp. Decl.).

[42] Plaintiff's declaration contains only the summary statement
that "others such as Dahlia Manning, Christopher Arizmendez, Janice
Lanier, and Rogelio Castro always got their lunches during the
designated periods."   Document No. 32, ex. A at 3.   It says nothing
regarding any other employees receiving a pay raise or being
granted vacation requests.   In response to her own counsel's
question, Plaintiff testified that she was unaware of any other
employees in her department who were granted vacation times similar
to those she requested.   Document No. 31, ex. A at 254.

14

for termination--namely, that it merely followed its policy of permitting an employee a maximum of six months of leave during any twelve-month period.  It notified Plaintiff of the policy by letter and provided her time to contact O'Neill by phone to discuss returning to work.[43]  Plaintiff failed entirely to respond, and was therefore terminated.

C.   Sexual Harassment

There are two species of sexual harassment claims under Title VII: (1) *quid pro quo* harassment and (2) harassment creating a hostile work environment.  The first step in evaluating a claim of sexual harassment is to determine whether the *quid pro quo* or hostile work environment standard applies.  *See* Williams v. Barnhill's Buffet Inc., 290 F. App'x 759, 761 (5th Cir. 2008) (citing Casiano v. AT&T Corp., 213 F.3d 278, 283 (5th Cir. 2000)).  This determination turns on whether the plaintiff has suffered a "tangible employment action."  Casiano, 213 F.3d at 283.  If she has, her suit is classified as a *quid pro quo* case; if she has not, her suit is classified as a hostile environment case.  Id.

---

[43] *See* Document No. 31, exs. A-13, A-14; Document No. 33, ex. F-C at OFFICEMAX 849.

15

1.    _Quid Pro Quo_ Sexual Harassment

To prevail on a _quid pro quo_ claim, an employee must show that she suffered a tangible employment action, and that the action suffered "resulted from [her] acceptance or rejection of [her] supervisor's alleged sexual harassment."   Id.   A "tangible employment action" is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Burlington Indus. v. Ellerth, 118 S. Ct. 2257, 2268 (1998).  Plaintiff asserts that she suffered the following tangible employment actions due to her rejections of Bowe's advances: denial of her scheduled lunch times; denial of a pay raise; denial of vacation time; denial of her transfer request; write-ups of each instance of tardiness "no matter how insignificant"; and finally, termination.[44]

Bowe's alleged delay of Plaintiff's lunch time, even if assumed true, does not rise to the level of a "tangible employment action" for the same reasons it does not qualify as an "adverse employment action" as discussed above.[45]  A change in the timing of her lunch break did not constitute a "significant change in employment status." _See_ Ellerth, 118 S. Ct. at 2268.  Likewise,

---

[44] Document No. 32 at 12-14.

[45] _See_ above at page 13.

16

absent exacerbating circumstances not present here, "[d]ocumented reprimands and transfer decisions unaccompanied by changes in salary, benefits, or job duties do not, however, qualify as tangible employment actions." Broussard v. Tex. Dep't of Crim. Justice, No. H-04-1059, 2006 WL 1517532, at *4 (citing Felton v. Polles, 315 F.3d 470, 487 (5th Cir. 2002), *abrogated on other grounds by* Burlington N. & Santa Fe Ry. Co. v. White, 126 S. Ct. 2405 (2006)); Burger v. Cent. Apartment Mgmt., Inc., 168 F.3d 875, 879 (5th Cir. 1999)).

On the other hand, termination is a tangible employment action, as is denial of a pay raise. *See* Ellerth, 118 S. Ct. at 2268; Lamb v. City of W. Univ. Place, 172 F. Supp. 2d 827, 832 (S.D. Tex. 2000) ("To the extent that Lamb contends that Peterson denied Lamb a pay raise to punish her for not responding to his advances, this claim also would amount to a *quid pro quo* claim."). Granting leave also has been recognized as an "ultimate employment decision" by the Fifth Circuit, and thus would qualify as a "significant change in employment status" so as to be a tangible employment action. *See* Slay v. Glickman, 137 F. Supp. 2d 743, 750 (S.D. Miss. 2001) (citing Burger, 168 F.3d at 878).

However, Plaintiff has failed to prove that her termination, denial of pay raise, or denial of vacation requests have any causal nexus with her rejection of Bowe's alleged advances. Plaintiff makes no allegation and points to no evidence that Bowe had any

input regarding her termination.  To the contrary, as summarized above, OfficeMax mailed letters to Plaintiff reminding her of its six-months absence policy and requiring her to contact O'Neill or otherwise respond, or else be considered to have relinquished her employment.[46]  Bowe's only communication in a series of internal OfficeMax emails regarding Plaintiff's leave was to confirm that her leave began on May 21, 2008, and to state that he had no medical documentation regarding her leave, because "Wendy O'[N]eill my HR contact has been dealing with her medical leave as well as our corporate legal and HR team."[47]

Similarly, Plaintiff has proffered no evidence that she was denied a pay raise because of her rejection of Bowe's alleged advances.  Plaintiff only asserts that she asked Bowe about a pay raise once, to which he responded she was already paid more than enough.[48]  Indeed, as noted previously, she was paid $10 per hour, almost at the top of the $7.25-$10.25 per hour pay range for cashiers.[49]  She presents no evidence that any other reason factored into her pay remaining the same during her nearly three years of employment.  Finally, Plaintiff has proffered no evidence connecting her rejection of Bowe's advances to his alleged denial

---

[46] *See* Document No. 31, exs. A-13, A-14, A-15 (letters); Document No. 33, ex. F-C at OFFICEMAX 849 (absence policy).

[47] Document No. 32, ex. 4 at 14.

[48] Document No. 31, ex. A at 199 (Rodriguez Depo.).

[49] *See supra* n.42.

of her vacation times.  Plaintiff asserts only that she asked Bowe four times between January and May 2008 how much vacation time she had accumulated, and that he said he would check but never followed through.[50]   She never requested specific vacation days, and, although she filled out leave request forms for unpaid time off, she did not fill out a form to request vacation time.[51]

Plaintiff has pointed to no evidence sufficient to raise a genuine issue of material fact that she suffered a tangible employment action as a result of Bowe's alleged sexual harassment. OfficeMax is therefore entitled to summary judgment on Plaintiffs' claims of sexual harassment under a *quid pro quo* theory.

### 2.   Hostile Work Environment

Even if Plaintiff's claim were treated alternatively under the hostile work environment theory as she requests,[52] OfficeMax is still entitled to summary judgment.   Under this theory, and assuming evidence of a hostile work environment, OfficeMax may avoid liability by affirmatively proving its Ellerth/Faragher defense: (1) that it exercised "reasonable care to prevent and correct promptly any such sexual harassment," and (2) that Plaintiff "unreasonably failed to take advantage of any

---

[50] Document No. 31, ex. A at 257-58.

[51] *See* id.; id., ex. B-3.

[52] *See* Document No. 32 at 15.

preventative or corrective opportunities provided by [OfficeMax] or to avoid harm otherwise." <u>Casiano</u>, 213 F.3d at 284; *see also* <u>Faragher v. Boca Raton</u>, 118 S. Ct. 2275, 2292-93 (1998); <u>Ellerth</u>, 118 S. Ct. at 2270.

OfficeMax has established its <u>Ellerth/Faragher</u> defense as a matter of law. The evidence is uncontroverted that it had a zero-tolerance policy toward harassment,[53] and an open-door policy encouraging employees to report "harassment of any kind" to (in successive order): their supervisor, their location manager; and their area Human Resources Representative.[54] Plaintiff knew of the harassment policy, which was in her employee handbook; she also saw the open door policy posted in her store.[55] *See* <u>Lauderdale v. Tex. Dep't of Crim. Justice</u>, 512 F.3d 157, 164 (2007) (holding that the employer's anti-harassment policies "satisfied the requirements of the first prong").

The facts as set forth previously, viewed in a light most favorable to Plaintiff, demonstrate that she never informed OfficeMax management of Bowe's offensive actions until talking with O'Neill *after* she already had departed on leave in late May 2008, never to return. Plaintiff therefore never offered OfficeMax an opportunity to cure the alleged violation. *See* <u>id.</u> (finding that

---

[53] *See* Document No. 31, ex. B-5.

[54] <u>Id.</u>, ex. A-16.

[55] <u>Id.</u>, ex. A at 38, 77-79, 82 (Rodriguez Depo.).

a complaint filed upon an employee's date of resignation does not defeat the Ellerth/Faragher defense "because it does not allow the employer to remediate the situation").   Although Plaintiff points to her February request to district manager Wendy Fila for a transfer, during that call she reported nothing except that Bowe did not "respect" her, with no elaboration or further details.   *Cf.* Casiano, 213 F.3d 287 (employee unreasonably failed to report when, in part, his earlier complaints "never raised one specter of direct sexual overtures, even implicitly," despite suffering "at least fifteen propositions").

Even when she reported to O'Neill after she stopped going to work, Plaintiff alleged only that Bowe had remarked about getting all the young girls, and that he had inappropriately touched her arms and offered to buy her lunch.[56]   O'Neill promptly investigated the allegations the next day, interviewing not only Bowe but also the three witnesses identified by Plaintiff herself.   Not one of those interviewed corroborated Plaintiff's allegations.   Plaintiff reported nothing else to management before filing her EEOC complaint.   *See* Lauder-dale, 512 F.3d at 165 ("In most cases, as here, once an employee knows his initial complaint is ineffective, it is unreasonable for him not to file a second complaint, so long as the employer has provided multiple avenues for such a complaint.").   The uncontroverted summary judgment evidence is that

---

[56] Id., ex. B at 2 (O'Neill Decl.); id., ex. B-1 at 2.

OfficeMax used reasonable care to prevent harassment and acted properly and reasonably when Plaintiff for the first time complained of alleged harassment after she went on leave; and that Plaintiff during her employment at OfficeMax wholly failed to take advantage of the preventative and corrective opportunities offered to her by OfficeMax to avoid harm.

D.   Title VII Retaliation

Plaintiff also claims that she was retaliated against in violation of Title VII due to her refusal of Bowe's sexual advances.   This claim follows the same burden-shifting approach used in Title VII discrimination cases. Strong v. Univ. Healthcare Sys., 482 F.3d 802, 805-06 (5th Cir. 2007). Under this approach, Plaintiff must first establish a *prima facie* case composed of the following elements: (1) that she engaged in a protected activity; (2) that an adverse employment action occurred; and (3) that there was a causal connection between her protected activity and the adverse action. Pierce v. Tex. Dep't of Crim. Justice, 37 F.3d 1146, 1151 (5th Cir. 1994).   In the context of retaliation, however, an "adverse employment action" is defined more broadly than in discrimination cases; it includes any action that "a reasonable employee would have found . . . [to be] materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of

22

discrimination." <u>Aryain v. Wal-Mart Stores Tex. LP</u>, 534 F.3d 473, 484 & n.9 (5th Cir. 2008) (quoting <u>Burlington N. & Santa Fe Ry. Co. v. White</u>, 126 S. Ct. 2405, 2415 (2006)).  If Plaintiff makes her *prima facie* case, the burden shifts to OfficeMax to proffer a legitimate, non-retaliatory reason for its actions, which then puts the burden on Plaintiff to show that Defendant's reasons are a pretext for retaliation.  To carry her ultimate burden, Plaintiff must show that the adverse action would not have occurred but for her protected activity.  <u>Strong</u>, 482 F.3d at 806.

Plaintiff asserts she was subjected to the following as a result of her rejection of Bowe's advances: he made fun of her accent and she "became a nobody"; he "began to make sure that she [was] written up whenever she was late"; and he threatened to terminate her employment.  Assuming that rejection of Bowe's advances is a "protected activity" within the meaning of Title VII retaliation law, Plaintiff's claim still fails.

As recounted previously, Bowe only twice made fun of her accent and commented that Hispanics were "good for nothing"--and one of those times was during the May 20 encounter in his office following Plaintiff's absence.[57]  As a matter of law, these two incidents--while offensive--do not rise to the level of actionable retaliatory conduct, and instead are more akin to the kinds of "petty slights, minor annoyances, and simple lack of good manners'

---

[57] *See* Document No. 31, ex. A at 149-50, 152-55, 217-18.

that employees regularly encounter in the work place . . . ."
Aryain, 534 F.3d at 485 (citing White, 126 S. Ct. at 2415).  Thus,
Plaintiff has not made a *prima facie* case as to her first
allegation.  With respect to her remaining allegations, even if
they present a *prima facie* case, Plaintiff has offered no evidence
to rebut OfficeMax's non-retaliatory reasons for her reprimands and
Bowe's threat of termination.  Plaintiff was reprimanded multiple
times for excessive tardiness before she ever allegedly rejected
Bowe's advances--including once before Bowe even arrived at the
store, and once within a week after his arrival.[58]  It was to be
expected that continued unexcused tardiness would merit continued
reprimands, at the very least.  And, indeed, Bowe's threat to fire
Plaintiff came in the context of a heated reprimand regarding her
latest absence, and after her most recent written reprimand--the
April 25 "Final Written Warning"--which warned that further
violations could result in termination.  In short, Plaintiff has
failed to raise a fact issue that, but for her rejection of Bowe's
alleged advances, she would not have been subjected to reprimands
and a threat of termination for her repeated attendance problems.

E.  Worker's Compensation Retaliation

     Plaintiff also alleges that her termination constitutes
unlawful retaliation against her for filing a worker's compensation

---

     [58] *See* above at page 5.

claim, in violation of section 451.001 of the Texas Labor Code. However, "[u]niform enforcement of a reasonable absence-control provision . . . does not constitute retaliatory discharge." <u>Tex. Div.-Tranter, Inc. v. Carrozza</u>, 876 S.W.2d 312, 313 (Tex. 1994). Indeed, if "termination is required by the uniform enforcement of a reasonable absentee policy, then it cannot be the case that termination would not have occurred when it did but for the employee's assertion of a compensation claim . . . ." <u>Cont'l Coffee Prods. Co. v. Cazarez</u>, 937 S.W.2d 444, 451 (Tex. 1996).

Here, OfficeMax has proffered as a non-retaliatory reason for Plaintiff's discharge the application of its neutral absence-control policy. As set forth previously, Plaintiff was absent from work for over six months, the maximum allowed leave in any twelve-month period. Plaintiff does not contest the reasonableness of this policy; instead, she asserts that its application was merely a pretext for retaliatory discharge because O'Neill "called her a liar and asked her to get back to work" soon after her injury, and internal OfficeMax emails among staff asked "when it would be safe to terminate" her employment.[59] However, none of these allegations has any bearing upon whether Plaintiff's termination "was required by the uniform enforcement" of the policy. *See* <u>Haggar Clothing Co. v. Hernandez</u>, 164 S.W.3d 386, 388 (Tex. 2005) (evidence of employer's discouragement of filing of worker's compensation claims

---

[59] Document No. 32 at 20-21.

and threats not to pay for medical treatment after an accident are immaterial if employee's "termination was required by the uniform enforcement of [the defendant's] one-year leave-of-absence policy").

Plaintiff nonetheless asserts that the policy was not uniformly applied, because she was terminated on May 22, 2009--just over a year after she began her leave, instead of six months. OfficeMax made several unsuccessful attempts by mail to notify Plaintiff of application of the six-months rule starting October 20, 2008, but used outdated addresses until its April 8, 2009 letter.[60]   Upon finally getting her then current address, rather than reminding her of the expiration of her six months of leave and considering her already terminated, OfficeMax gave Plaintiff an *additional* week to contact O'Neill to avoid termination.[61]   In short, the additional time before Plaintiff's termination was due to OfficeMax's attempts to ensure that she was fully apprised of the policy and to give her every opportunity to "discuss her return to work" prior to termination.[62]   There is no summary judgment evidence that application of the policy--and the leniency demonstrated--was a pretext for retaliation.  OfficeMax is there-

---

[60] Document No. 31, exs. A-13, A-14; Document No. 33, ex. F ¶ 6; id., ex. F-C at OFFICEMAX 846, 864, 872, 874.

[61] Document No. 31, exs. A-13, A-14.

[62] *See* id., ex. A-13.

fore entitled to summary judgment on Plaintiff's worker's compensation retaliation claims.

F.   Intentional Infliction of Emotional Distress

Finally, OfficeMax is entitled to summary judgment on Plaintiff's claim of intentional infliction of emotional distress. This "'gap-filler' tort [was] never intended to supplant or duplicate existing statutory or common-law remedies." Creditwatch, Inc. v. Jackson, 157 S.W.3d 814, 817 (Tex. 2005). All of Plaintiff's complaints stem from actions that "are covered by other statutory remedies," and therefore do not support her intentional infliction of emotional distress claim. See id.

### III.   Order

_____For the foregoing reasons, it is

ORDERED that Defendant OfficeMax North America, Inc.'s Motion for Summary Judgment (Document No. 31) is GRANTED, and Plaintiff Yenifer Rodriguez's claims are DISMISSED WITH PREJUDICE.

The Clerk will enter this Order and provide a correct copy to all parties.

SIGNED at Houston, Texas, on this 6th day of January, 2011.


_____
EWING WERLEIN, JR.
UNITED STATES DISTRICT JUDGE

27